1

2

3

4

5

6

7

8                       UNITED STATES  DISTRICT COURT

9                          Northern District of California

10                              Oakland Division

11   PAUL A. STEVENSON,                          No. C 10-04837 LB

12                    Plaintiff,          **ORDER REGARDING CROSS-**
                                          **MOTIONS FOR SUMMARY**
13            v.                          **JUDGMENT**

     MICHAEL ASTRUE, Commissioner of
14   Social Security Administration,      **[ECF Nos. 17 & 20]**

15                    Defendant.
     _____/

16

17                              **I. INTRODUCTION**

18        Plaintiff Paul Stevenson moves for summary judgement, seeking judicial review of a final

19   decision by Defendant Michael Astrue, the Commissioner of Social Security Administration,

20   denying him Social Security Income disability benefits for his claimed disability of scoliosis and

21   mood disorders.  Plaintiff's Motion, ECF No. 17.[1]  The Administrative Law Judge ("ALJ") found

22   that Mr. Stevenson could work in jobs that exist in significant numbers in the national economy, and

23   denied Social Security Income ("SSI") disability benefits.  Administrative Record ("AR") at 19.

24        Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court

25   without oral argument.  All parties have consented to the court's jurisdiction.  *See* ECF Nos. 5&8.

26   For the reasons stated below, the court **GRANTS IN PART** Mr. Stevenson's motion for summary

27   _____

28        [1]Citations are to the Electronic Case File ("ECF") with pin cites to the electronic page
     number at the top of the document, not the pages at the bottom.

judgment, **DENIES** the Commissioner's cross-motion for summary judgement, and **REMANDS** this case to the Social Security Administration for further proceedings regarding the vocational expert's deviation from a definition in the Dictionary of Occupational Titles ("DOT"), as described below.

## II. PROCEDURAL HISTORY

Mr. Stevenson, now 50, applied for disability benefits on January 8, 2008.  AR 120-26.[2]  He alleged that he had been unable to work since November 7, 2002, due primarily to mood disorders and scoliosis.  AR 120.  The Commissioner denied his application both initially and upon reconsideration.  AR 58-60.  Mr. Stevenson timely requested a hearing before an ALJ on August 28, 2008.  AR 82-83.

An ALJ conducted a hearing on March 9, 2010, in Oakland, California.  AR 26-57.  Mr. Stevenson appeared with his attorney, David Calbert, and testified at the hearing along with vocational expert Malcolm Brodzinsky.  AR 26.  The ALJ found on April 23, 2010, that Mr. Stevenson was not disabled because there were jobs that exist in significant number in the national economy and that he could perform.  AR 19.  The Appeals Council denied Mr. Stevenson's request for review on September 18, 2010.  AR 1-3.  On October 26, 2010, Mr. Stevenson timely sought judicial review under 42 U.S.C. § 405(g).  Complaint, ECF No. 1.  Both sides move for summary judgment. Plaintiff's Motion, ECF No. 17; Defendant's Opposition and Motion, ECF No. 20.

## III.  LEGAL STANDARD

**A.  <u>Standard of Review</u>**

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted).  "Substantial evidence means more

---

[2] Mr. Stevenson's actual filing date was January 8, 2008, and his protective filing date was December 31, 2007.  AR 10, 120; *see* 20 C.F.R. § 416.345 (a written or oral inquiry for benefits is treated as the filing date for the application of benefits).

than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

**B. Applicable Law: Five Steps To Determine Disability**

An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A) & (B).

The Social Security regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(I).
>
> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).
>
> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. ss 404.1520(a)(4)(iii).
>
> **Step Four.** Considering the claimant's residual functional capacity, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).
>
> **Step Five.** Considering the claimant's residual functional capacity, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   other jobs in significant numbers in the national economy: (1) by the testimony of a vocational

2   expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart
    P, app. 2.  If the Commissioner meets this burden, the claimant is not disabled.

3       For steps one through four, the burden of proof is on the claimant.  At step five, the burden shifts

4   to the Commissioner.  *See Tackett*, 180 F.3d at 1098.

5                    **IV. SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS**

6       This section summarizes (A) the medical evidence in the administrative record, (B) Mr.

7   Stevenson's testimony, (C) the vocational expert's testimony, and (D) the ALJ's findings.

8   **A.  Medical evidence**

9       Mr. Stevenson is 50 years old.  AR 30.  He originally alleged he was unable to work due to

10  various ailments including severe depression, suicidal mood, bi-polar disorder, antisocial disorder,

11  back pain resulting from scoliosis, and leg problems linked to a car accident.  AR 147.  In his

12  request for reconsideration he also made a specific mention of memory troubles subsequent to

13  former drug abuse.  AR 72.

14  **1.  Dr. Adrian James: Treating Physician**

15      Mr. Stevenson's primary treating physician, Dr. Adrian James, began treating him in as early as

16  March 26, 1997.  AR 532.  Dr. James' treatment record shows that he has seen Mr. Stevenson on a

17  regular basis at least since April 2000.  AR 232.  Dr. James consistently diagnosed Mr. Stevenson

18  with lumbar tenderness and back pain.  *See, e.g.,* AR 232 and 513.  Mr. Stevenson had an x-ray in

19  November 2008 that showed scoliosis and "minimal multilevel disc narrowing."  AR 266.  To treat

20  Mr. Stevenson's back pain, Dr. James regularly prescribed medications such as Ultram, Tylenol with

21  codeine, and Vicodin.  AR 232, 345, 349.  He also prescribed a series of drugs, including Zoloft and

22  Vistaril, to treat Mr. Stevenson's depression.  AR 345, 349.  At least on one occasion (August 15,

23  2008), Mr. Stevenson exhibited a suicidal mood during his interview with Dr. James.  AR 515.

24  After declaring that he planned to cut his wrists, Dr. James called the police, who took Mr.

25  Stevenson to the Alameda County Medical Center for an evaluation.  AR 515, 482-84.

26      In the treating physician questionnaire that he completed on November 17, 2008, Dr. James

27  diagnosed Mr. Stevenson with chronic back pain, lumbar tenderness, scoliosis, and depression.  AR

28  507.  Dr. James limited Mr. Stevenson to lifting no more than five pounds, standing or walking for

no more than one-third of an eight-hour workday, and sitting for no more than 30 minutes at a desk or workstation. *Id.* He also concluded that Mr. Stevenson's mood disorders would preclude reliable full-time employment and that his pain, depression, and Vicodin treatment interfered with his concentration and would prevent reliable performance of simple tasks during a typical 40-hour work week. *Id.* Dr. James rated Mr. Stevenson's ability to deal with work-related stress, as well as his ability to understand and carry out complex or detailed instructions, as "poor or none." AR 508-09. Dr. James also described as "fair" Mr. Stevenson's ability to understand simple instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. *Id.*

### 2. Dr. Manougian: Treating Physician

Beginning on September 9, 2009, Dr. Edward Manougian, a chronic pain management specialist, also treated Mr. Stevenson. AR 520. He diagnosed Mr. Stevenson with chronic pain syndrome (with depression, anxiety, poor judgment, and cognitive problems), visual impairment, scoliosis, lumbar spondylosis, osteoarthritis in the knees, and psychiatric issues. *Id.* at 523. He prescribed him Oxycontin, Soma, Vicodin, Valium, and Methadone and instructed him to return in four weeks. *Id.* Dr. Manougian saw Mr. Stevenson a total of eight times between September 9, 2009 and March 10, 2010. AR 542-545. On each visit, Mr. Stevenson reported either a seven or eight out of ten for his worst pain level or a zero or three out of ten for his best pain level. *Id.* Dr. Manougian prescribed Mr. Stevenson Oxycontin, Vicodin, Tylenol #4, Soma, Valium, and Phenergan with codeine on October 7 and November 4, 2009. AR 526-27.

On November 4, 2009, Dr. Manougian completed the same questionnaire that Dr. James did, and he made similar findings – namely, that Mr. Stevenson would not be able to lift more than five pounds, stand or walk for more than one-third of an eight-hour workday, or sit for more than 30 minutes at a desk or workstation. AR 518. He also determined that Mr. Stevenson's mental impairments would preclude reliable full-time work and that his concentration impairment would preclude reliable performance of simple tasks during a typical 40-hour work week. *Id.*

### 3. Emergency Room Records

On September 27, 2006, Mr. Stevenson went to the Alameda County Medical Center emergency

1    room after he was hit by a car while riding a bicycle.  AR 280.  He was initially "combative" and

2    tested positive for cocaine (which he admitted to using earlier in the day).  AR 275, 280.  Doctors

3    diagnosed him with facial lacerations.  AR 276.

4        On December 17, 2006, Mr. Stevenson was taken to the Alameda County Medical Center

5    emergency room by police officers.  AR 271.  Apparently, he had fought during an arrest, and the

6    police officers were seeking medical clearance.  *Id.*  He complained of back and neck pain.  *Id.*  He

7    walked into the emergency room without difficulty and did not have muscle spasms.  *Id.*

8    **4. Alameda County Jail Records**

9        The administrative record contains various treatment documents created during Mr. Stevenson's

10   numerous stays in Alameda County jails.[3]  First, initial screening records for the Alameda County

11   Behavioral Health Care Service dated December 17, 2006 indicate that Mr. Stevenson reported

12   chronic pain and scoliosis, had red eyes and poor grooming, was "med seeking" (with a focus on

13   pain killers), exhibited clear speech, and was "manipulative."  AR 293.  The clinician diagnosed him

14   with opioid abuse.  AR 294.  She noted that while Mr. Stevenson denied suicidal or homicidal

15   ideation, he was "extremely focused on obtaining pain killers."  AR 293-95.

16       Next, on January 16, 2007, Mr. Stevenson told officials at Santa Rita Jail that he gave up cocaine

17   "1-3 months ago."  AR 291.  Rehabilitation Counselor Penelope Russell, Ph.D. noted that Mr.

18   Stevenson was "well groomed in Blues," and that he was "somewhat pressured" and "demand[ed]

19   help [with] SSI."  AR 292.  He requested to work in the kitchen.  *Id.*  She diagnosed him with an

20   adjustment disorder, anxiety, depressive mood, and a personality disorder.  *Id.*

21       Later, in October and November 2007, jail officials prescribed Zoloft and Vistaril for Mr.

22   Stevenson.  AR 296, 298, 300.  Initial screening records dated October 6, 2007 indicate that Mr.

23   Stevenson reported depression and that he exhibited "entitled and annoying behaviors."  AR 289.

24   According to the records, he wanted "pills to sleep" and for depression.  *Id.*  His mood was anxious,

25   his insight was fair and his judgment was impaired while his cognition, memory, and orientation

26   were within normal limits.  *Id.*  Mr. Stevenson showed "pill seeking behavior" and was "annoying at

27

28       [3] In 1994, Mr. Stevenson was ordered to complete domestic violence classes, and he has been
     "in and out" of Santa Rita jail since then for failing to do so.  AR 291.

UNITED STATES DISTRICT COURT
For the Northern District of California

1  times." AR 290.  He also said that he was trying to get SSI benefits.  *Id.*  The clinician diagnosed

2  him with adjustment disorder, anxiety, and depressive mood.  *Id.*

3      Other records dated October 25, 2007 mention that Mr. Stevenson showed suicidal ideation

4  while he was in custody.  AR 288.  The assessment report describes him as "stressed out" and

5  lacking both "insight" and "coping skills."  *Id.*  The counselor diagnosed him with depression and

6  back pain.  *Id.*  A progress note mentions that Mr. Stevenson demonstrated "mild mental

7  retardation."  AR 287.

8      **5. Dr. Shertock: Social Security Psychological Consultative Examination**

9      On March 16, 2008, Tania Shertock, Ph.D. examined Mr. Stevenson at the request of the

10  Department of Social Services.  AR 399.  Dr. Shertock noted that Mr. Stevenson's behavior was

11  "barely cooperative throughout the session" and that he "appeared to be a dubious historian."  AR

12  399.  He stated that he was physically abused as a child and that he was "kicked out of school" and

13  was involved in the juvenile justice system.  *Id.*  He was in "Special Education classes" in school

14  and claimed that he could not read or write "beyond a very primitive level."  *Id.*  Dr. Shertock found

15  "no psychomotor agitation or retardation."  AR 400.  Mr. Stevenson was "unable to recall detailed,

16  autobiographical, and historical information" (he was able to remember three of three items

17  immediately but none within three minutes).  *Id.*  He was "unable to relate in an adequate manner."

18  *Id.*  She found that Mr. Stevenson was "clearly malingering" so the "extent of any mood disorder

19  [was] not clear."  AR 401.  She also stated, "During the mental status exam, the claimant appeared to

20  be presenting himself in an unfavorable light."  *Id.*  Dr. Shertock concluded that Mr. Stevenson

21  would have some problems interacting with others and that while he arrived to his appointment on

22  time, she could not predict whether he would be capable of conforming to a typical work schedule.

23  *Id.*  She further determined that Mr. Stevenson could maintain concentration, persistence, and pace,

24  and is able to perform simple repetitive tasks and detailed tasks but not complex tasks.  *Id.*  Dr.

25  Shertock found that he may have difficulty adapting to work stress and change and would have

26  difficulty maintaining a schedule on a consistent basis.  *Id.*  Finally, she stated, "Based on the mental

27  status examination, it is my impression that concentration, persistence, and pace are not significantly

28  impaired."  *Id.*  Dr. Shertock diagnosed Mr. Stevenson with polysubstance dependence, dysthymic

1  mood disorder, malingering, and antisocial personality disorder. *Id.* According to her, "from a

2  psychiatric standpoint[,] prognosis is poor." *Id.*

3       **6. Dr. Nguyen: Social Security Orthopedic Consultative Examination**

4       Todd Nguyen, D.O. performed a comprehensive orthopedic evaluation on March 29, 2008. AR

5  404-07. Mr. Stevenson reported a long history of low back pain following a scoliosis diagnosis

6  when he was 13. AR 404. The pain worsened after he was hit by a vehicle in or about January

7  2008. *Id.* He also developed bilateral knee pain. *Id.* Dr. Nguyen stated:

8       He is able to get up from the chair with no difficulty and is able to walk into and out of the exam
     room without any assistance or any assistive device. He is able to sit comfortably for more than

9       15 minutes during the interview, and has no problem getting on and off the exam table. He is
     able to bend over to remove his shoes without any apparent discomfort.

10

11  AR 405. An examination revealed "moderate scoliosis" and "severe tenderness to very superficial

12  palpation" but no muscle spasm. AR 406. The straight leg raising was negative. *Id.* Dr. Nguyen

13  concluded that Mr. Stevenson's range of motion in his lumbar spine was "mildly limited." AR 407.

14  The neurological exam was "significant for breakaway weakness in the lower extremities." *Id.* The

15  knee exam was "grossly within normal limits." *Id.* He also noted, "The evidence of mul[t]iple

16  Waddell's signs raise the possibility of symptom magnification versus non-organic cause of the low

17  back pain." *Id.*

18       Based on his examination, Dr. Nguyen concluded that Mr. Stevenson could walk, stand, and sit

19  at least six hours, with breaks every four hours during an eight-hour day. *Id.* He also found that Mr.

20  Stevenson was capable of carrying 50 pounds frequently and 100 pounds occasionally. *Id.* Mr.

21  Stevenson could also perform occasional bending, stooping, kneeling, and crawling. *Id.*

22       **7. Suicidal Episode in August 2008**

23       On August 15, 2008, after reporting suicidal thoughts during a visit to Dr. James, the police

24  brought Mr. Stevenson to the Alameda County Medical Center. AR 485. Mr. Stevenson went to see

25  Dr. James because he was depressed and wanted to slash his wrists. *Id.* He reported depression

26  after he was evicted from his sister's home, his "wife" was with a new man, and several family

27  members died. AR 480. He claimed that he did not drink alcohol or smoke but that "about a week

28  ago a friend had him try cocaine to see if it would help his mood, but that got him more depressed."

1  *Id.* Mr. Stevenson exhibited a "bad" mood, a well-modulated affect, a linear thought process, a

2  grossly intact cognitive function, and fair insight and judgment. *Id.* Pria Joglekar, M.D., the

3  examining physician, stated that "[t]here is a concern that the patient is malingering for SSI, and is

4  med seeking for pain medications and BZD's [sedatives]." AR 481. She diagnosed him with an

5  adjustment disorder with mixed disturbance of emotions and conduct as well as scoliosis. *Id.*

6      Mr. Stevenson exhibited similar symptoms on August 16, 2008. AR 483. He expressed

7  "suicidal ideation, only with prompting, his mental [status did] not [otherwise] suggest significant

8  acute suicide risk." *Id.* Dr. Michael Minzenberg prescribed him Effexor rather than Zoloft at Mr.

9  Stevenson's request. *Id.* One day later, Mr. Stevenson reported feeling "somewhat better, though

10  still depressed." AR 484. He felt more hopeful and denied thoughts of cutting his wrists. *Id.* Dr.

11  Heather Clague noted that Mr. Stevenson seemed "particularly concerned with documentation of his

12  visit [here]." *Id.* She recommended a follow-up appointment with Sausal Creek Oupatient Clinic.

13  *Id.*

14      At the follow-up appointment on August 21, 2008, Mr. Stevenson, who was "incoherent and

15  over-presumptuous in the course of the interview," reported having "weird hallucinations about dead

16  people" and stated that he had suicidal intentions three days prior. AR 468-69. A nurse gave him a

17  cane to help him with his balance. AR 470. The records show his suicide risk factors are rated 64

18  on a scale of 100. AR 472. The psychiatric assessment mentions that he is alert, well-oriented and

19  well groomed, that his speech, insight, judgment, and thought process are normal, and that his mood

20  is anxious and his affect is sad. AR 475. Mr. Stevenson claimed that he had not used drugs in three

21  years but tested positive for cocaine. AR 474. The psychiatrist diagnosed him with depression,

22  scoliosis, and cocaine abuse. AR 475.

23      On September 9, 2008, Alameda County Mental Health CRISIS Evaluation records show that

24  Mr. Stevenson was dealing with chronic depression and persistent suicidal ideation "due to his life

25  long inability to function in the community and multiple losses (death of parents and relatives and 2

26  violent deaths of his nephews)." AR 487. He also requested refills of his Effexor and Trazodone.

27  *Id.* He denied drug and alcohol abuse but tested positive for cocaine. *Id.* When the physician

28  confronted Mr. Stevenson about the positive result, he became "somewhat belligerent." AR 496.

UNITED STATES DISTRICT COURT
For the Northern District of California

Mr. Stevenson seemed to be "put off" at times by questions that the interviewer asked him.  AR 488. The report mentions that the patient was a "poor historian" and "reluctant to answer questions."  AR 495.  He also indicated that he had a life-long inability to function and spent two years in juvenile detention after he and a friend "beat another peer to a point where there was a possibility that the victim would die." AR 488.  Mr. Stevenson was "essentially illiterate and ha[d] to have help reading and writing."  *Id.*  His judgment and insight appeared to be impaired, and his cognition appeared to be somewhat "obtunded."  *Id.*  He was diagnosed with depression, cocaine abuse, scoliosis, urinary hesitancy, and decubitis ulcers.  *Id.*

**8. Global Assessment of Functioning Scores**

The Global Assessment of Functioning ("GAF") scale (0 through 100) is a numeric scale used by clinicians to rate the social, occupational, and psychological functioning of adults.  *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d. 595, 598 n.1 (9th Cir. 1999).  "A GAF between 41 and 50 indicates the presence of serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)."  *Id.*

Over time, health care professionals have rated Mr. Stevenson with the following GAFs:

- December 17, 2006, Alameda county behavior health care services: 65.  AR 294.
- October 19, 2007, Alameda county behavior health care services: 40.  AR 290
- October 25, 2007, Alameda county behavior health care services: 50.  AR 288.
- November 1, 2007, Alameda county behavior health care services: 50.  AR 339.
- March 16, 2008, Dr. Shertock: 50.  AR 401.
- August 15, 2008, Alameda county medical center (intake evaluation): 40.  AR 481.
- August 17, 2008, Alameda county medical center (exit evaluation): 60.  AR 484
- August 21, 2008, Sausal Creek Clinic: 45.  AR 471.
- September 9, 2008, Alameda county department of behavioral health care services: 45.  AR 490.
- September 9, 2008, Alameda county department of behavioral health care services: 55.  AR

UNITED STATES DISTRICT COURT
For the Northern District of California

1        497.[4]

2        **B.  Mr. Stevenson's testimony**

3            Mr. Stevenson appeared before an ALJ on March 9, 2010.  AR 26.  Attorney David Calbert

4        represented him at the hearing.  *Id.*  The following is a summary of the facts to which Mr. Stevenson

5        testified at that hearing.

6            Mr. Stevenson was born on December 31, 1960.  AR 30.  He is not married, but he has four

7        children and he spends part of his time at their mother's house and refers to her as his girlfriend.  AR

8        31, 39.  He sometimes stays with his sister, his friends, or in the streets for a few days.  AR 45.

9        Before his application, he spent several months in jail for failure to attend domestic violence classes.

10       AR 41.  Mr. Stevenson said that he did not have the patience to complete the classes.  *Id.*

11           He left school in the eight grade after being sent to jail for beating and seriously injuring another

12       student.  AR 31, 44.  After dropping out of school, he never had any kind of vocational training.  AR

13       33.  He has trouble reading simple words, such as those mentioned on a grocery list, or

14       understanding the scores on the sports page of a newspaper.  AR 31-32.  He does not have a driver's

15       license and has never attempted to take the test because he "didn't think [he] would probably pass it

16       no way [sic]."  AR 32.  He cannot type or use a computer and has never had a full-time job or earned

17       money from a job at a substantial level over the past 15 years.  AR 34, 40.  He last worked as a

18       janitor in a warehouse but he cannot remember when.  *Id*.

19           Mr. Stevenson has suffered from lower back pain since he was a teenager.  AR 35.  He quantifies

20       his pain as 7-8 on a scale of 10.  AR 36.  He takes various medications for his pain including

21       Vicodin, Tylenol with codeine, Oxycontin, and Valium.  *Id.*  He has trouble walking too much or

22       lifting up anything.  AR 37.  He also suffers from pain in his knees and arthritis in his hands.  AR 42.

23           With regard to his mental difficulties, Mr. Stevenson reports that he does not "function very

24       well" and suffers from chronic depression due to his personal history and to the death of many

25       people around him.  AR 38.   He takes Trazodone and Paxil for depression.  AR 46.  Mr. Stevenson

26       does not get along very well with other people except for his immediate relatives.  AR 40.  He has

27       _____

28           [4]  Two different physicians examined Mr. Stevenson on September 9, 2008, and they
         assigned him different GAF scores.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    sleeping disorders, sleeps only a few hours a night, and naps approximately four hours per day.  AR

2    45-46.  He stays in the house every day and will only go to the front porch to sit and talk with his

3    children before returning inside.  AR 46.  On a typical day, Mr. Stevenson watches television with

4    his girlfriend.  AR 46, 48.

5        Mr. Stevenson says that he lost a job once because he could not find the location.  AR 47.  He is

6    "really not a good speller" and does not know how to read a map.  *Id.*  Though he struggled with

7    cocaine in the past, thanks to his children, his girlfriend, and his family members, he had been sober

8    for the past five or six months at the time of the hearing.  AR 38, 47.

9    **C.  Vocational Expert Testimony**

10        Vocational expert Brodzinsky testified at the hearing.  AR 49.  Mr. Stevenson has no significant

11   job history so the ALJ questioned the vocational expert only about various hypothetical situations.

12   *Id.*

13        Based on Mr. Stevenson's age, education, and work experience, and with the restrictions as

14   summarized by the ALJ (able to lift up to 20 pounds occasionally; lift or carry up to 10 pounds

15   frequently; stand or walk for six hours and sit for approximately six hours per eight hour day with

16   normal breaks; frequently climb ramps or stairs and occasionally climb ladders, ropes or scaffolds;

17   frequently balance; occasionally stoop, kneel, crouch and crawl; work limited to simple, routine, and

18   repetitive tasks in a work environment free of fast-paced production requirements involving only

19   simple work-related decisions with few if any workplace changes; and only incidental (*i.e.*, less than

20   occasional) interaction with the public), Mr. Brodzinsky initially concluded that the combination of

21   different restrictions would not allow for any unskilled, light, or sedentary employment.  AR 50.

22   After the ALJ clarified that the hypothetical restrictions did not preclude all production

23   requirements, but only those involving fast-paced, assembly line type of production, the expert

24   found that Mr. Stevenson could be a night housekeeping cleaner.  AR 52.  He testified that there

25   were approximately 100,000 positions of night cleaner nationally and 1,500 in the Bay Area.  *Id.*

26        Mr. Brodzinsky also found that Mr. Stevenson could work as night patrol inspector, which he

27   described as "someone who is working at night walking around or using a cart to ride around a

28   commercial establishment and making sure that all things are okay," without having to hold a

UNITED STATES DISTRICT COURT
For the Northern District of California

1   weapon.  AR 52.  He testified there were about 100,000 night patrol inspector positions in the

2   national economy and between 1,500 and 2,000 in the Bay Area.  AR 53.

3       Mr. Brodzinsky also found that if Mr. Stevenson could sit for no more than thirty minutes with

4   no prolonged standing, the less-than-five-pound lifting limitation would preclude all work.  *Id.*  He

5   also found that illiteracy would not prevent Mr. Stevenson from accepting a housekeeping cleaner

6   position because about 50% of the workers received training on how to identify products because

7   they could not read English.  AR 55.  He also found that the housekeeping cleaner position required

8   stooping, kneeling, and crouching at a maximum of one-third of the workday.  *Id.*

9   **D.  Administrative Findings**

10      Applying the sequential evaluative process, on April 13, 2010, the ALJ held that Mr. Stevenson

11  was not disabled under Section 1614(a)(3)(A) of the Social Security Act and therefore was not

12  entitled to supplemental security income.  AR 19.

13      At step one, the ALJ found that the claimant had not engaged in substantial gainful activity since

14  December 31, 2007, the application date.  AR 12.

15      At step two, the ALJ found that Mr. Stevenson suffered from the following severe impairments:

16  dysthymia, anti-social personality disorder, substance abuse, scoliosis, arthritis of the knees, and

17  obesity.  *Id.*

18      At step three, the ALJ found that Mr. Stevenson did not suffer from an impairment or

19  combination of impairments that either was listed in the regulations or was medically equivalent to

20  one of the listed impairments.  *Id.*

21      The ALJ then determined Mr. Stevenson's residual functional capacity in order to assess at steps

22  four and five whether he could perform his past relevant work or any other work considering his age,

23  education, and work experience.  The ALJ found that Mr. Stevenson had a residual functional

24  capacity to (A) lift 20 pounds occasionally and 10 pounds frequently; (B) sit for up to 6 hours, and

25  stand and walk for approximately 6 hours, in an 8-hour workday, with normal breaks; and (C) climb

26  ramps or stairs frequently, climb ladders, ropes and scaffolds occasionally, balance frequently, and

27  stoop, kneel, crouch and crawl frequently.  *Id.*  With respect to non-exertional limitations, he found

28  that Mr. Stevenson was limited to simple, routine, and repetitive tasks involving simple work-related

UNITED STATES DISTRICT COURT
For the Northern District of California

1   decisions in an environment free of fast-paced production requirements and with few, if any,

2   workplace changes.  *Id.*  In addition, he specified that the work must be limited to only incidental

3   (*i.e.*, less than occasional) contact with the public.  *Id.*

4          In making this finding of residual functional capacity, the ALJ considered the symptoms and

5   how consistent they were with the objective medical evidence (based on the requirements of 20

6   C.F.R. § 404.1529 and Social Security Rulings 96-4p and 96-87p).  AR 14.  He also considered

7   opinion evidence under 20 C.F.R. § 404.1527 and Social Security Rulings 96-2p, 96-5p, 96-6p, and

8   06-3p.  *Id.*  He followed a two-step process, first determining whether there was a medically-

9   determinable physical or mental impairment that reasonably could be expected to produce Mr.

10  Stevenson's pain and symptoms, and then evaluating the intensity, persistence, and limiting effects

11  of the symptoms to determine the extent that they limited Mr. Stevenson's ability to do basic work

12  activities.  *Id.*  For the second part, whenever Mr. Stevenson's statements about the intensity or

13  functionally limiting effects of pain or other symptoms were not substantiated by objective medical

14  evidence, the ALJ made findings on the credibility of the statements "based on a consideration of the

15  entire record."  *Id.*

16         After summarizing the evidence in the record, the ALJ found that Mr. Stevenson's "medically

17  determinable impairments could reasonably be expected to cause the alleged symptoms; however,

18  [Mr. Stevenson's] statements concerning the intensity, persistence and limiting effects of these

19  symptoms are not credible to the extent they are inconsistent with the above residual functional

20  capacity."  AR 16.  He relied on the RFC assessments by the State agency orthopedic and

21  psychological consultants, Drs. Nguyen and Shertock, and accorded them significant probative

22  weight because "they are consistent with the preponderance of the objective medical evidence of

23  record as a whole."  AR 16-17.  The ALJ then determined that despite Dr. Nguyen's opinion that he

24  could perform heavy work, viewing the evidence in the light most favorable to Mr. Stevenson, Mr.

25  Stevenson was capable of only a limited range of light work with the limitations enumerated in his

26  previously articulated RFC.  AR 17.  He discounted Dr. James's and Dr. Manougian's opinions

27  because they were largely based on Mr. Stevenson's subjective complaints rather than the objective

28  medical evidence.  *Id.*  The ALJ found that Dr. Manougian did not have "an extensive and reliable

**UNITED STATES DISTRICT COURT**
For the Northern District of California

longitudinal perspective upon which to base his restrictive RFC finding" because it appeared that Mr. Stevenson saw him only twice in the 30 days preceding his medical source statement. *Id.* The ALJ also found it "rather suspect" that Mr. Stevenson "conveniently decided to seek treatment with Dr. Manougian immediately prior to his request for Dr. Manougian's statement, when [Mr. Stevenson] has not had any pain management treatment before then." *Id.* Despite these findings, the ALJ gave Mr. Stevenson "the benefit of great doubt" and considered Dr. James's and Dr. Manougian's opinions in his RFC determination. *Id.*

The ALJ further determined that Mr. Stevenson's testimony was not credible. *Id.* He cited both State agency examining doctors who noted that Mr. Stevenson appeared to by malingering and magnifying his symptoms. *Id.* Moreover, Mr. Stevenson had an extensive history of drug-seeking behavior, had been in and out of jail from 1994 to 2007, had been mandated to take domestic violence classes which he never completed, and had broken parole. *Id.* Lastly, Mr. Stevenson never voluntarily sought psychiatric treatment and had an "extremely poor work record." AR 17-18.

Having determined Mr. Stevenson's residual functional capacity, the ALJ proceeded with steps four and five of the sequential evaluative process.

Proceeding to step five, the ALJ found that considering the claimant's age, education work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, such as night patrol inspector (light exertion, unskilled with 100,000 jobs available nationally and 1,500 regionally). AR 18. He determined that the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles. AR 19. The ALJ then concluded that Mr. Stevenson has not been under a disability, as defined by the Social Security Act, from December 31, 2007, date of the application. AR 19.

## V. DISCUSSION

Mr. Stevenson challenges the ALJ's decision on two grounds: (A) the ALJ erred by rejecting Dr. James's and Dr. Manougian's medical opinions and, as a consequence, made erroneous findings regarding Mr. Stevenson's residual functional capacity and (B) the ALJ erred by finding that significant jobs existed in the national economy that Mr. Stevenson could perform. Plaintiff's

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Motion, ECF No. 17, at 6-7.

2    **A.  Residual Functional Capacity**

3        Mr. Stevenson challenges the ALJ's rejection of the opinions of treating physicians Dr. James

4    and Dr. Manougian that he was severely limited in his ability to perform work in a normal workday.

5    Plaintiff's Motion, ECF No. 17 at 16-21.  He argues that their opinions were not contradicted and

6    therefore, the ALJ failed to provide clear and convincing reasons for discounting them.  *Id.* at 16.

7    With respect to his mental capabilities, Mr. Stevenson contends that, though not identical, Dr.

8    Shertock's assessments that he had a GAF of 50, some problems interacting with others and

9    adapting to stress and changes, and difficulty maintaining a schedule on a consistent basis were

10   consistent with Dr. James's assessments.  *Id.*  The ALJ's failure to point to a specific subjective

11   complaint upon which Dr. James relied means that he did not provide clear and convincing reasons

12   for discounting the opinion.  *Id.* at 17.  According to Mr. Stevenson, the objective medical evidence

13   in the record also supports Dr. James's conclusions, including consistently low GAF ratings.  *Id.* at

14   18.

15       With respect to the physical limitations, Mr. Stevenson argues that the ALJ failed to provide

16   specific legitimate reasons that are based on substantial evidence in the record for rejecting Dr.

17   James's opinion.  *Id.*  He contends that Dr. Nguyen's findings of severe tenderness to palpation,

18   limited flexion, and scoliosis are identical to Dr. James's assessments and that the ALJ erred by

19   dismissing the pain assessments as not corroborated by objective medical evidence.  *Id.* at 18-19.

20   Moreover, the ALJ "mistakenly believed that Dr. Manougian was not providing continuing

21   treatment" and "mistakenly thought that lab test [sic] ordered by Dr. Manougian had not been

22   performed."  *Id.* at 20.  He also contends that the ALJ wrongfully rejected Dr. Manougian's opinion

23   because an ALJ cannot reject an opinion merely because a doctor gave it for purposes of a disability

24   claim.  *Id.*

25       When determining whether a claimant is disabled, the ALJ must consider each medical opinion

26   in the record together with the rest of the relevant evidence.  20 C.F.R. § 416.927(b); *Zamora v.*

27   *Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010).  "Opinions of

28   examining physicians are afforded more weight than those of non-examining physicians, and the

UNITED STATES DISTRICT COURT
For the Northern District of California

1   opinions of examining non-treating physicians are afforded less weight than those of treating

2   physicians." *Orn v. Astrue*, 495 F.3d 625, 631 (9ᵗʰ Cir. 2007) (citing 20 C.F.R. § 416.927(d)(1)-(2));

3   *see also* 20 C.F.R. § 404.1527(d).   A treating physician's opinion is accorded controlling weight if it

4   is supported by "medically acceptable diagnostic techniques and is not inconsistent with other

5   substantial evidence in the record." *See Holohan v. Massanari*, 246 F.3d 1195, 1202 (9ᵗʰ Cir. 2001).

6   It is not entitled to controlling weight, however, where substantial evidence in the record contradicts

7   the opinion. *See Orn*, 495 F.3d at 632 (citing 20 C.F.R. § 404.1527(d)(2)).   Nonetheless, even if the

8   treating physician's opinions are not entitled to controlling weight, they still are entitled to

9   deference. *Id.*

10       Similarly, to reject the uncontradicted opinion of a treating or examining physician, the ALJ

11   must provide "clear and convincing reasons that are supported by substantial evidence." *Ryan v.*

12   *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9ᵗʰ Cir. 2008).   Even if a treating or examining doctor's

13   opinion is contradicted, the ALJ may not reject the opinion without providing "specific and

14   legitimate reasons supported by substantial evidence." *Id.*   Opinions of non-examining doctors

15   alone cannot provide substantial evidence to justify rejecting either a treating or examining

16   physician's opinion. *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9ᵗʰ Cir. 1999).

17   An ALJ may rely partially on the statements of non-examining doctors to the extent that independent

18   evidence in the record supports those statements. *Id.*   Moreover, the "weight afforded a

19   non-examining physician's testimony depends 'on the degree to which they provide supporting

20   explanations for their opinions.'" *See Ryan*, 528 F.3d at 1201 (quoting 20 C.F.R. § 404.1527(d)(3)).

21   **1. Mr. Stevenson's Psychological Limitations**

22       Here, substantial evidence in the record contradicts Dr. James's and Dr. Manougian's opinions

23   regarding Mr. Stevenson's capabilities; therefore, the ALJ properly discounted their opinions.   First,

24   with respect to the claimant's mental impairments, Dr. Shertock's conclusions directly contradict

25   important aspects of Dr. James's report.   While they agree that Mr. Stevenson suffers from

26   depression, concentration, and memory problems and that he would have problems interacting with

27   other people or conforming to a typical work schedule, the two opinions diverge on the credibility of

28   Mr. Stevenson's complaints and, therefore, on the extent of his underlying disabilities. *Compare* AR

UNITED STATES DISTRICT COURT
For the Northern District of California

1   507 *with* AR 399-402.  According to Dr. Shertock, Mr. Stevenson was "clearly malingering," and

2   "appeared to be presenting himself in an unfavorable light."  AR 401.  Dr. Shertock also concluded

3   that Mr. Stevenson's concentration, persistence, and pace are not significantly impaired.  *Id.*

4   Various other medical records also conclude that Mr. Stevenson is "manipulative" and "extremely

5   focused on obtaining pain killers."  AR 293-95.  Other records show that he was a "poor historian"

6   who was "reluctant to answer questions" (AR 495) and that he was "somewhat pressured" and

7   "demand[ed] help [with] SSI" (AR 292).  Additionally, he became "somewhat belligerent" when

8   doctors confronted him about his testing positive for cocaine.  AR 496.  Dr. Nguyen found that Mr.

9   Stevenson was exaggerating his physical limitations, and Dr. Joglekar, too, was concerned that Mr.

10  Stevenson was "malingering for SSI."  AR 407, 481.  Lastly, Dr. Elizabeth Harrison's psychiatric

11  consultative review also largely confirmed Dr. Shertock's assessments.  AR 419-21 (finding only

12  moderate limitations in Mr. Stevenson's ability to understand and remember detailed instructions,

13  carry out detailed instructions, maintain attention and concentration for extended periods, interact

14  appropriately with the general public, and respond appropriately to changes in the work setting).

15      Dr. Shertock's conclusion, teamed with the other medical evidence on record, constitute specific

16  and legitimate reason supported by substantial evidence in the record that contradicts Dr. James' and

17  Dr. Manougian's findings, and thus justify the ALJ's rejection of the portions of their opinions that

18  do not conform with the residual functional capacity.  The ALJ's conclusion that Mr. Stevenson

19  could perform simple, routine, and repetitive tasks involving simple, work-related decisions in a

20  work environment free of fast pace production requirements, few, if any, work place changes, and

21  incidental contact with the public is supported by the substantial evidence in the record.  AR 14.

22      **2.  Mr. Stevenson's Physical Limitations**

23      The ALJ also properly discounted Dr. James's and Dr. Manougian's opinions regarding Mr.

24  Stevenson's physical limitations.  Both Drs. James and Manougian diagnosed Mr. Stevenson with

25  chronic pain and scoliosis (Dr. Manougian also found osteoarthritis in his knees, lumbar

26  spondylosis, and psychiatric issues) and found that he could lift no more than five pounds for 1/3 of

27  an eight-hour workday, that he could not work at a job requiring that he stand or walk for 3/4 of an

28  eight-hour workday, that he could not perform consistent and reliable full-time sedentary work for

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1   most of a workday, that he suffers from psychiatric impairments that would preclude full-time work,

2   and that he suffers from concentration/attention impairments or learning/reading disabilities which

3   would preclude reliable performance of simple repetitive tasks throughout a full-time 40-hour work

4   schedule.  AR 507, 518.  Dr. Nguyen's conclusions directly contradict these findings.  AR 407.

5   First, he found that Mr. Stevenson's range of motion was only mildly limited and that he was

6   "significant for breakaway weakness in the lower extremities."  *Id.*  In addition, Dr. Nguyen

7   concluded that Mr. Stevenson showed Waddell's signs which "raised the possibility of symptom

8   magnification versus non-organic cause of the low back pain."  *Id.*  Mr. Stevenson was able to get up

9   from the chair in the exam room with no problems, walk into and out of the exam with no problems,

10  sit comfortably for more than 15 minutes during the exam, get on and off the exam table with no

11  problems, and bend over to remove his shoes with no problems.  AR 405.  Therefore, Dr. Nguyen

12  determined that Mr. Stevenson could walk, stand, and sit for at least six hours with normal breaks

13  during an eight-hour workday; lift 50 pounds frequently and 100 pounds occasionally; and

14  occasionally bend, stoop, kneel, and crawl.  *Id.*

15      Other records support Dr. Nguyen's conclusions.  Mr. Stevenson's physical limitations did not

16  prevent him from requesting to work in the kitchen during his January 2007 time in jail.  AR 292.

17  Nor did his physical limitations prevent him from fighting during his arrest in December 2006 or

18  from moving around without difficulty following his subsequent visit to the emergency room.  AR

19  271.  Dr. Sudhir Jainuni's physical consultative review also supports Dr. Nguyen's conclusions.  She

20  specifically found that Dr. James's findings were not supported by "MER or exam [and are] given

21  no [weight]."  AR 422-26.  These constitute specific and legitimate reasons supported by substantial

22  evidence in the record to justify discounting Dr. James's and Dr. Manougian's opinions.  Moreover,

23  the ALJ's conclusion – that Mr. Stevenson could lift 20 pounds occasionally and 10 pounds

24  frequently, sit for up to six hours and stand or walk for approximately six hours in an eight-hour

25  workday with normal breaks, climb ramps or stairs frequently, climb ladders, ropes and scaffolds

26  occasionally, balance frequently, and stoop kneel, crouch, and crawl frequently – is supported by

27  substantial evidence in the record.

28      Mr. Stevenson's argument that the ALJ "mistakenly believed that Dr. Manougian was not

1  providing continuing treatment" and that he "mistakenly thought that lab test [sic] ordered by Dr.

2  Manougian had not been performed" fails.  The ALJ correctly pointed out that Dr. Manougian only

3  saw Mr. Stevenson twice before he completed the questionnaire.  AR 538-40, 542.  After completing

4  the questionnaire, he saw Mr. Stevenson on December 16, 2009, January 13, 2010, February 10,

5  2010, and March 10, 2010.  AR 543-44.  Each time, Mr. Stevenson reported the worst pain he was in

6  as seven, eight, or nine out of ten and the least pain he was in as zero or three out of ten.  *Id.*  In

7  response, Dr. Manougian prescribed him various drugs including Oxycontin, Vicodin, Tylenol #4,

8  Soma, Valium, and Phenergan with codeine.  AR 527, 553-58.  Dr. Manougian did not perform any

9  objective tests (other than lab tests) to check Mr. Stevenson's subjective complaints.  AR 543-44.

10  The ALJ's mistake regarding Mr. Stevenson's treatment history with Dr. Manougian therefore does

11  not change the fact that substantial evidence in the record contradicts Dr. Manougian's findings and

12  supports the ALJ's RFC determination.

13  **3.  Mr. Stevenson's Credibility**

14      Substantial evidence in the record also supports the ALJ's determination that Mr. Stevenson

15  lacked credibility.  To determine whether a claimant's testimony about subjective pain or symptoms

16  is credible, the ALJ must engage in a two-step analysis.  *See Vasquez*, 572 F.3d at 591 (citing

17  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).  First, the ALJ must determine

18  whether the claimant has presented objective medical evidence of an underlying impairment that

19  reasonably could be expected to produce the alleged pain or other symptoms.  *See Lingenfelter*, 504

20  F.3d at 1036.  Second, if the claimant meets the first test and there is no evidence of malingering, the

21  ALJ can reject the claimant's testimony about the severity of his symptoms only by offering

22  specific, clear, and convincing reasons for doing so.  *Id.*  When the ALJ finds a claimant's testimony

23  not reliable, the ALJ must "specifically identify what testimony is credible and what testimony

24  undermines the claimant's complaints."  *Morgan*, 169 F.3d at 499.  This court defers to the ALJ's

25  credibility determination if it is supported by substantial evidence in the record.  *See Thomas*, 278

26  F.3d at 959.

27      Here, Drs. Shertock, Nguyen, and Joglekar, and both state examining physicians, all found that

28  Mr. Stevenson was malingering.  AR 401, 407, 418, 426, 481.  He also had no significant work

ORDER (C 10-04837 LB)

1   record over the past 15 years and lied regarding his use of drugs and exhibited drug seeking behavior

2   on numerous occasions.  AR 496.  The ALJ properly cited this evidence as reasons for discounting

3   Mr. Stevenson's credibility.  *Thomas*, 278 F. 3d at 959 (9th Cir. 2002) (a poor work record and a lack

4   of candor regarding drug abuse support negative conclusion regarding claimant's veracity).

5   **B.  Vocational Expert's Testimony Regarding Jobs in the National Economy**

6        Mr. Stevenson argues that the ALJ did not meet his burden at step five because (1) the

7   hypothetical situations that he propounded to the vocational expert did not reflect all of his

8   limitations, (2) the vocational expert's equivocal testimony was not adequate to meet the

9   Commissioner's burden, and (3) the ALJ's finding was contrary to the Dictionary of Occupational

10  Titles.  Plaintiff's Motion, ECF No. 17 at 21.  Mr. Stevenson claims that the hypothetical situations

11  did not reflect a plethora of psychological limitations that various doctors concluded were necessary.

12  *Id.* at 22-24.  He also contends that the ALJ "pressured" the vocational expert to name "night

13  cleaner" as a potential job after he changed the hypothetical situations.  *Id.* at 25-26.  Lastly, because

14  "night patrol inspector" as defined by the DOT requires the ability to drive and Mr. Stevenson does

15  not have a driver's license, the ALJ's finding that Mr. Stevenson could work as a "night patrol

16  inspector" contradicts the DOT and warrants remand.  *Id.* at 26-28.

17       At step five, if (considering residual functional capacity, age, education, and work experience)

18  the claimant is able to do other work, the Commissioner must establish that there are a significant

19  number of jobs in the national economy that the claimant can do.  20 C.F.R. § 404.1520(a)(4)(v).

20  The Commission may sustain its burden at step five by posing hypothetical questions to a vocational

21  expert that are based on a claimant's residual functional capacity.  The vocational expert may give

22  evidence about jobs that a hypothetical employee with the same residual functional capacity as the

23  claimant would be able to perform.  *See* 20 C.F.R. ss  404.1520(g).  A vocational expert's

24  recognized expertise provides the necessary foundation for his or her testimony, and no additional

25  foundation is required.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217-18 (9th Cir. 2005).  The

26  hypothetical questions must be based on a residual functional capacity for which there exists

27  substantial support in the record.  *See Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989).

28       Here, the hypothetical situations mimic the residual functional capacity that this court already

ORDER (C 10-04837 LB)

1    found was supported by substantial evidence in the record.  *Compare* AR 14 (RFC) *with* AR 49

2    (hypothetical situations).  As a result, they reflect all of Mr. Stevenson's limitations.

3        The vocational expert's testimony was not equivocal.  Contrary to Mr. Stevenson's contention,

4    the ALJ did not "pressure" the vocational expert to name "night cleaner" and "night patrol

5    inspector" as potential jobs that Mr. Stevenson could perform.  Plaintiff's Motion, ECF No. 17 at 25.

6    Instead, the ALJ clarified the vocational expert's misinterpretation of the hypothetical situation so

7    that Mr. Stevenson was not precluded from all production requirements, just fast-paced production

8    requirements.  AR 50-52.  Once the vocational expert properly understood the hypothetical situation,

9    he testified that Mr. Stevenson could perform duties as a "night cleaner" and "night patrol

10   inspector."  AR 52-53.  His testimony therefore was not contradictory.

11       Lastly, an ALJ must rely primarily upon the DOT for guidance as to the employee requirements

12   for different job types in the national economy.  *See Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th

13   Cir. 2007).  The DOT creates a rebuttal presumption as to the job classification.  *See Tommasetti v.*

14   *Astrue*, 533 F.3d 1035, 1042 (9th Cir. 2008).  Although the ALJ may also consult testimony from

15   vocational experts, the ALJ must ask the vocational expert "'if the evidence he or she has provided'

16   is consistent with the Dictionary of Occupational Titles and obtain a reasonable explanation for any

17   apparent conflict."  *See Massachi*, 486 F.3d at 1153 (quoting Social Security Ruling 00-4p at *4).

18   After finding a discrepancy, "the ALJ must then determine whether the vocational expert's

19   explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather

20   than the Dictionary of Occupational Titles."  *Id.*

21       At the hearing, the vocational expert defined a "night patrol inspector" as "someone who is

22   working at night walking around or using a cart to ride around a commercial establishment and

23   making sure that all things are okay."  AR 52.  By contrast, the DOT describes the functions of a

24   night patrol inspector as follows:

25       Patrols scheduled route to inspect operation of illuminated and animated signs.  Drives company
         car along scheduled route at night.  Inspects signs covered by company maintenance contract for
26       specified appearance and operation.  Reports faulty operation to service department.  May
         perform minor repairs, such as replacing light bulbs.
27

28   AR 221.

UNITED STATES DISTRICT COURT
For the Northern District of California

ORDER (C 10-04837 LB)

1    Mr. Stevenson asserts that according to the DOT, the job requires the ability to drive a car and,

2    consequently, a valid driver's licence.  Plaintiff's Motion, ECF No. 26-27.  Mr. Stevenson testified

3    that he does not have a driver's license, that he has never taken the test, and that he believes he

4    would not be able to pass the test.  AR 32.  The Commissioner contends that driving a company car

5    does not necessarily require a driver's license if the driving takes place on private roads.

6    Defendant's Opposition and Motion, ECF No. 20 at 10.  The Commissioner also argues that

7    although Mr. Stevenson does not currently have a driver's license, he presented no evidence

8    showing that he could not pass the test.  *Id.* at 10-11.

9    The court finds that the ALJ failed to provide an explanation as to why the vocational expert's

10   deviation from the DOT was warranted.  Instead, he simply stated, "Pursuant to SSR 004-p, the

11   vocational expert's testimony is consistent with the information contained in the Dictionary of

12   Occupational Titles."  AR 19.  Given the discrepancy between the vocational expert's testimony and

13   the DOT, and the absence of any information supporting the contention that driving would be

14   limited to private roads, the ALJ's statement is inadequate to support his finding at step five that Mr.

15   Stevenson could perform work as a "night patrol inspector."  But as the Commissioner correctly

16   argues, it is unclear whether Mr. Stevenson's disabilities prevent him from obtaining a driver's

17   license and therefore preclude him from finding work as a "night patrol inspector."  In this situation,

18   remand for "enhancement of the record would be useful."  *Benecke v. Barnhart*, 379 F.3d 587, 593

19   (9th Cir. 2004) (citation omitted).  Accordingly, the court remands this case to the Commissioner for

20   further administrative proceedings related to Mr. Stevenson's ability to obtain a driver's license.

### VI. CONCLUSION

22   The court **GRANTS IN PART** Mr. Stevenson's motion for summary judgment and **DENIES**

23   the Commissioner's cross-motion for summary judgement.  The court **REMANDS** this case to the

24   Commissioner for further proceedings consistent with this order.

25   This disposes of ECF Nos. 17 & 20.

26   **IT IS SO ORDERED.**

27   Dated: September 22, 2011

28

LAUREL BEELER
United States Magistrate Judge

ORDER (C 10-04837 LB)

23